# EXHIBIT 8

LEXSEE



Caution
As of: Jun 28, 2012

## TOTAL CONTAINMENT, INC. v. DAYCO PRODUCTS, INC.

## CIVIL ACTION NO. 1997-cv-6013

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## 2001 U.S. Dist. LEXIS 15838

**September 6, 2001, Decided**
**September 6, 2001, Filed; September 6, 2001, Entered**

**DISPOSITION:** [*1] Defendant Dayco Product's Motion in Limine GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff purchaser sued defendant pipe seller for breach of the price provisions in the parties' supply agreement. After a jury found in favor of the purchaser, the court ordered remittitur or a partial retrial on damages. At retrial, the purchaser proffered an economic expert's report linking lost sales and profits to the pipe seller's price increase. The pipe seller moved to exclude the report.

**OVERVIEW:** After holding a Daubert hearing, the court concluded that the economic expert's report was unreliable because the expert ignored the fact that the purchaser had lost sales before the price increase went into effect, assumed without justification that the purchaser's market share would have remained constant even after entry into another market, and relied upon improper sources in determining the respective market shares of the purchaser's competitors. Moreover, the expert had based his economic analysis on unreliable economic data given the known difficulties in using a report used solely for debt payment obligations. Since the purchaser had not produced sufficient evidence that the economic expert's report was reliable and well grounded, it was to be excluded from the upcoming retrial.

**OUTCOME:** The motion to exclude the economic expert's report was granted.

**CORE TERMS:** price increase, market share, pipe, jobber, lost profits, reliability, reliable, economic expert, expert testimony, unreliable, competitor, major oil, base year, methodology, unsupported, retrial, sales figures, supplemental report, prediction, marketing, announced, pricing, limine, foot, expert witness, verification, speculation, scientific, personnel, economist

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Evidence > Scientific Evidence > Daubert Standard*
*Evidence > Testimony > Experts > Admissibility*
[HN1]District court judges serve as evidentiary screens or gate keepers to prevent the introduction of purported expert testimony reached without proper scientific foundation. The gate keeping function assigned to district court judges also applies to non-scientific experts such as economists. Whether an expert may testify is entrusted to the trial judge's discretion. However, a court must be careful not to exclude evidence solely on the basis of the general credibility of an expert's testimony.

*Evidence > Testimony > Experts > General Overview*
[HN2]See Fed. R. Evid. 702.

*Evidence > Testimony > Experts > Qualifications*

[HN3]Under Fed. R. Evid. 702, a court must conduct a threefold inquiry before permitting expert testimony. The testimony must come from a qualified expert witness, be based on reliable methods, and "fit" the facts of the case.

**Evidence > Testimony > Experts > General Overview**
[HN4]While the proponent of an expert need not prove that his or her opinions are correct, it must prove, by a preponderance of the evidence, that his or her testimony is reliable. The test for reliability is an exacting one and the expert will be held to the intellectual rigor of his field.

**Evidence > Scientific Evidence > General Overview**
**Evidence > Testimony > Experts > Admissibility**
[HN5]Judicial precedent establishes eight criteria to determine the reliability of expert testimony: (1) whether a method consists of a testable hypothesis, (2) whether the method has been subject to peer review, (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation, (5) whether the method is generally accepted, (6) the relationship of the technique to methods which have been established to be reliable, (7) the qualifications of the expert witness testifying based on the methodology, and (8) the non-judicial uses to which the method has been put. These factors do not constitute a definitive checklist or test.

**Evidence > Testimony > Experts > Admissibility**
[HN6]In determining the admissibility of expert testimony, courts must assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions. Nothing requires a court to accept an opinion tied to existing data only through an expert's ipse dixit. To that end, the United States Court of Appeals for the Third Circuit finds that an expert may not testify where an economic expert's testimony rests on faulty assumptions. Although mathematical exactness is not required, expert testimony of post-injury earning capacity must be based upon the proper factual foundation.

**Evidence > Testimony > Experts > Admissibility**
[HN7]Courts have not hesitated to exclude an economic expert where their testimony is not supported by sufficient evidence or engaged in mere speculation.

**COUNSEL:** For TOTAL CONTAINMENT, INC., PLAINTIFF: PHILIP G. KIRCHER, JENNIFER DU-FAULT JAMES, RALPH G. WELLINGTON, MAR-GARET S. WOODRUFF, J. ROBERT STOLTZFUS, THOMAS S. BLOOM, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: NA-THAN A. SCHACHTMAN, McCARTER & ENGLISH, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: GLENN P. CALLAHAN, MC CARTER & ENGLISH, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: MARK L. MANEWITZ, MICHAEL T. HEYRICH, FRANK E. DERBY, CYNTHIA V. FITZGERALD, JAMES J. SAVAGE, SKADDEN, ARPS, SLATE, MEAGHER, AND FLOM, LLP, NEWARK, NJ USA.

For DAYCO PRODUCTS, INC., DEFENDANT: JOHN A. AMODEO, SKADDEN, ARPS, SLATE, ET AL., WASHINGTON, DC USA.

For DAYCO PRODUCTS, INC., DEFENDANT: ED-WARD V. FILARDI, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, NEW YORK, NY USA.

**JUDGES:** Berle M. Schiller, J.

**OPINION BY:** Berle M. Schiller

**OPINION**

**MEMORANDUM AND ORDER**

**SCHILLER, J.**

**September 6, 2001**

**INTRODUCTION**

On May 3, 2001, I ordered remittitur of all but $ 1,325,808 of Total Containment's (TCI) $ 23,000,000 verdict against Dayco or a partial retrial of [*2]  this action limited to the assessment of damages incurred due to Dayco's breach of a 1993 Supply Agreement between the parties. For the retrial, TCI proffered a June 2001 Supplemental Report ("The June 2001 Report") by its economic expert, Dr. William Latham, III linking a portion of its lost sales and profits to Dayco's price increase. By Memorandum Order on July 19, 2001, I found TCI could try to establish that link at retrial. Dayco then moved to exclude Dr. Latham's testimony on the basis that his latest opinion on lost sales failed to satisfy the criteria of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). I held a "Daubert" hearing at which both Dr. La-

tham and Dayco's economic expert, Dr. Geoffrey Osborne, testified as to the reliability of Dr. Latham's economic analysis. However, because Dr. Latham's arrived at his expert opinion by an unreliable methodology, I rule that he may not testify as to the contents of his June 2001 report reflecting lost sales and profits.

## I. BACKGROUND

Pursuant to the 1993 Supply Agreement, Dayco charged $ 3.75 for each linear foot of Dayco's primary pipe. [1] On August 2, 2001, Dayco [*3]  mailed a letter to TCI advising TCI that the price per foot of primary pipe would be raised to $ 5.00. Following talks between Dayco and TCI, Dayco lowered the price to $ 4.40. TCI yielded and purchased the primary pipe at $ 4.40.

> 1   Dayco had previously asserted that the 1993 Supply Agreement fixed $ 4.19 as the cost per foot for the primary pipe. However, in a memorandum Dayco advised the Court that it was willing to agree that the price in effect as of August 2, 1995 was $ 3.75 per foot. See Dayco's Memorandum and Opposition to TCI's Motion in Limine to Preclude Dayco Products, Inc. from Relitigating the Existence of the Supply Agreement and the Contract Price, and to Preclude the Testimony of Richard Bing, at 2 (doc. 246-1, August 8, 2001).

TCI sued Dayco, alleging that Dayco had breached warranty and price provisions of the 1993 Supply Agreement. At the first trial, TCI sought direct damages in the amount of $ 1,325,808 -- the total "overcharge" on the primary pipe. However, TCI did not explicitly pursue [*4]  consequential damages as a result of the price increase at the first trial. Rather, TCI sought compensation for lost profits and sales without specifying whether those losses were ascribable to their breach of warranty claim or their breach of pricing claim. [2]

> 2   As discussed in my July 19, 2001 Memorandum, TCI's earlier representations as to the cause of their lost profits were hardly a model of consistency or clarity.

Consonantly, Dr. Latham's earlier expert reports lacked any suggestion that the price increase caused TCI to suffer consequential damages in the form of lost profits or sales. Indeed, at the fall of 2000 trial, Dr. Latham testified, "With the price increase, that was all in the past. So there are no future damages at all." See Tr. Trans. Nov. 3, 2000, at 29. Dr. Latham's report contained many references to the "pipe problem" -- evidently his shorthand for the alleged defects in the Dayco primary pipe [3] -- as the source of TCI's future losses.

> 3   See e.g. Tr. Trans., Nov. 3, 2000, at 16 ("One of the costs that TCI has suffered is in the area of profits they've lost on sales because they haven't been able to make because of the defective pipe problem").

[*5]  The first jury found TCI's claim time-barred and awarded it $ 23 million on its pricing claim. However, because nothing on the record at the first trial supported an award of that magnitude, I ordered remittitur or a new trial limited to assessing damages on TCI's breach of pricing claim.

TCI opted for a new trial. It now explicitly seeks both direct and consequential damages (i.e. lost sales and profits) on its breach of pricing claim. To that end, TCI elicited a supplemental report from Dr. Latham ascribing a portion of TCI's lost profits to the price increase. Contradicting his testimony at the October 2000 trial, Dr. Latham now opines that TCI lost sales and profits as a result of Dayco's price increase. He divided TCI's buyers into two categories: major oil companies and small convenience store operations. Dr. Latham and TCI admit that TCI cannot prove lost sales of the Enviroflex system to major oil companies which use long term contracts less susceptible to price fluctuations.

For the independent jobber market, or that part of the market which excludes major oil companies and includes convenience stores, Dr. Latham attempted to construct a model of the market share percentages [*6]  of TCI and its competitors in the years immediately preceding and following the price increase. Dr. Latham claims that such data was not readily available, so Dr. Latham searched for total sales figures by TCI and its two main competitors in the independent jobber market: Advanced Polymer Technologies (APT) and Environ. TCI handily provided him with information regarding its own sales; hard data on APT and Environ sales proved more elusive. Relying on representations by TCI employees, he concluded that APT "was selling only into this jobber market and not into the major oil market." Daubert Hrg. Trans. at 13. He then incorporated into his data pool APT's total sales figure of $ 11 million from a Dun and Bradstreet report. He based his sales figures for Environ from a former Environ salesperson whom TCI had hired. The employee had brought a great deal of Environ sales data with him during his move to TCI. He also claims to have consulted trade journals. Using the raw total sales data, he then determined the volume and percentage of each company's sales into the independent jobber market.

Comparing TCI's market share percentage in 1994 with its actual percentage of sales in 1996 [*7]  and 1997, he opined that TCI lost $ 1,195,000 in sales within the independent jobber market during 1996 and 1997. Then, relying on assertions by TCI marketing personnel,

he claimed that TCI would have retained 80% of its customers from year to year and concluded that TCI lost sales of $ 1,710,000 from 1997 through 2000.

Dayco moved to preclude Dr. Latham from testifying as to lost sales at the upcoming trial. At the *Daubert* hearing, Dayco probed into the reliability of Dr. Latham's methodology through the testimony of its own economic expert, Mr. Osborne. Mr. Osborne, a certified public accountant, works as a financial adviser at Price WaterhouseCoopers. He specializes in damage assessment and investigations and has been involved in over 200 determinations of lost profits. Mr. Osborne criticized Dr. Latham for using 1994 as a base year instead of 1995, the year in which Dayco announced the price increase. A study of TCI's 1995 sales figures, Mr. Osborne noted, shows that TCI began to lose sales well before the price increase was announced in August 1995 and before the first payments were due in October 1995. He also faults Dr. Latham for using the Dun and Bradstreet report as [*8] the sole source of APT's sales into the independent jobber market. Such sources are not the type which a professional economist would rely upon in conducting a market share analysis to determine lost profits. In sum, Dayco argues, these errors reduce Dr. Latham's analysis to mere speculation, and his testimony at trial would prejudicially provide a "patina" of economic legitimacy to an unsupported damage claim.

## II. DR. LATHAM'S TESTIMONY FAILS TO MEET THE RELIABILITY REQUIREMENTS OF *DAUBERT v. MERRELL DOW PHARMACEUTICALS.*

### A. *Daubert*

[HN1]District court judges serve as evidentiary screens or gate keepers to prevent the introduction of purported expert testimony reached without proper scientific foundation. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994)*("Paoli"). The gate keeping function assigned to district court judges is now also applied to non-scientific experts such as economists. *See Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000)*(citing *Kumho Tire v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. [*9] Whether an expert may testify is entrusted to the trial judge's discretion. *See Kumho Tire, 526 U.S. at 152; Elcock, 233 F.3d at 740-41* However, a court must be careful not to exclude evidence solely on the basis of the general credibility of an expert's testimony. *See Elcock, 233 F.3d at 751 n.8.*

*Federal Rule of Evidence 702* was recently amended to reflect the district court's gatekeeping role under *Daubert* and its progeny:

> [HN2]If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[HN3]As under the precursor to the current Rule, a court must conduct a threefold inquiry before permitting expert testimony. It must: come from a qualified expert witness, be based on [*10] reliable methods, and "fit" the facts of the case. *See Paoli, 35 F.3d at 741-43; Saldana v. Kmart Corp., No. 99-4055, 260 F.3d 228, 2001 U.S. App. LEXIS 16583* (3d Cir. Jul. 23, 2001). The present inquiry focuses on the reliability and fitness of Dr. Latham's methods and conclusions.

[HN4]While the proponent of an expert need not prove that his or her opinions are correct, it must prove, by a preponderance of the evidence, that his or her testimony is reliable. *See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999); Paoli, 35 F.3d at 743.* The Supreme Court has emphasized that the test for reliability is an "exacting" one. *Weisgram v. Marley Co., 528 U.S. 440, 451, 145 L. Ed. 2d 958, 120 S. Ct. 1011 (2000)*, and the expert will be held to intellectual rigor of his field. *See Kumho Tire, 526 U.S. at 152 (1999);* Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 19 (Federal Judicial Center, 2d ed. 2000); [HN5]The Supreme Court and the Third Circuit have, combined, established eight criteria to [*11] determine the reliability of expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to

which the method has been put. See *Paoli*, 35 F.3d at 742 n.8. These factors do not constitute a "definitive checklist or test." *Kumho Tire*, 526 U.S. at 150 (quoting *U.S. v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

[HN6]Courts must also assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions. See *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000); *Paoli*, 35 F.3d at 749. Nothing requires a court to accept an opinion tied to existing data only through an expert's "ipse dixit." *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). [*12] To that end, the Third Circuit has found that an expert may not testify where an economic expert's testimony rests on faulty assumptions. See, e.g. *Elcock*, 233 F.3d at 754-55. "Although mathematical exactness is not required, expert testimony of post-injury earning capacity must be based upon the proper factual foundation." *Elcock*, 233 F.3d at 754 (quoting *Benjamin v. Peter's Farm Condo. Owners Ass'n.*, 820 F.2d 640, 643 (3d Cir. 1987)). Thus, in *Elcock*, the Third Circuit ordered the exclusion of economic expert evidence which set the plaintiff's potential earnings at $ 12,000 a year where the record showed that the plaintiff made only $ 5,574 in the year preceding her injury.

[HN7]Other courts have not hesitated to exclude an economic expert where his testimony is not supported by sufficient evidence or engaged in mere speculation. See e.g. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (exclusion warranted where esteemed economic expert Robert Hall had not considered all relevant facts in relevant market when performing market share analysis); *Target Market Publishing v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998) [*13] (where economic expert's projections of lost profits unsupported and based on mere speculation, district court may exclude proposed testimony); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (approving exclusion of testimony based on conjecture and faulty assumptions); *JMJ Enters. v. Via Veneto Italian Ice*, 1998 U.S. Dist. LEXIS 5098, at *18-19, 97-0652 (E.D. Pa. Apr. 15, 1998) ("JMJ") (Kelly, J.). Particular instructive is *JMJ*. The court excluded JMJ's damages expert because the expert relied on the plaintiff's tax returns without independent verification -- despite the fact that plaintiff had admitted that not all sales were properly recorded. See *id. at *19*. Furthermore, the expert conducted no independent market survey or study, though the expert knew little about the market and these are common tools to predict the potential of any business. See *id. at *20*. The court found the expert had violated a professional guideline requiring greater attention be given to those assumptions with a greater impact on pros-

pective results. See *id. at *21* (quoting American Institute of Certified Public Accountants Guideline 6.31).

[*14] **B. Application**

Dr. Latham's opinions on lost sales contained in his June 2001 Supplemental Report are unreliable and do not rest upon good grounds. He hypothesizes that, but for the price increase in August 1995, TCI would have maintained the market share it held in 1994. His conclusions and the underlying data on which they are based lack reliability because: (1) Dr. Latham simply ignores the fact that TCI lost sales in 1995 before the price increase went into effect, assumes without justification that TCI's market share would remain constant even after the entry of Environ into the market; (2) relied on improper sources in determining the respective market shares of TCI's competitors. I note that TCI did not introduce any textbooks, accounting procedure guidelines, economic valuation manuals, or other treatises approving of Dr. Latham's methods. Thus, any justification of those methods must come from the record created to date.

**1. Selection of 1994 as a Base Year and Failure to Account for Causes of Lost Market Share External to Price Increase**

First and foremost, Dr. Latham unjustifiably assumed that TCI's 34% market share in 1994 would have remained unchanged but [*15] for the price increase. This assumption is not based upon the "realities of the market" in which TCI was engaged. Compare *Concord Boat*, 207 F.3d at 1056. Mr. Osborne testified that no professional economist would properly use 1994 as the base year, nor is there any propriety in skipping a year sequentially in computing a lost market share computation. He emphatically testified that skipping 1995 in projecting lost profits lacked any professional propriety. *Daubert* Hrg., Aug. 10, 2001, at 104.

At the *Daubert* hearing, Dr. Latham offered only two reasons for using 1994 as a base year. First, he asserted that 1994 was the last full year before TCI felt the effect of the price increase. See *Daubert* Hrg., Aug. 10, 2001, at 28. However, monthly and quarterly data of TCI's 1995 sales were available, and he could have used them in his model to compare TCI's sales before and after the price increase.

Second, he claims that TCI "was doing a lot of one-night called damage control [sic] with respect to the effects of the defective pipe in the market." *Daubert* Hrg., Aug. 10, 2001, at 28. [4] He reiterated that position during his colloquy with the court. See [*16] *Daubert* Hrg., Aug., 10, 2001, at 75-76. His explanation actually undermines his use of 1994 as a base year: TCI lost a significant amount of sales in 1995 before the price in-

crease was announced in August 1995 and its effects felt in November 1995. One TCI executive has already admitted that TCI's loss in sales between 1994 and 1995 was unrelated to the price increase. *See e.g.* Boehmer Dep., July 27, 2001, at 180. Dr. Latham also failed to account for new marketplace pressures which TCI faced in 1995 -- the emergence of Environ as a competitor to TCI and its aggressive marketing strategies. Thus, the dip in TCI's market share from its high in 1994 to its low in 1996 could easily be attributed to any number of the factors which emerged in 1995. Indeed, a review of Dr. Latham's data shows that TCI's market share actually grew after Dayco announced its price increase in August 1995.

> 4   Randy Braun, TCI's Vice President of Sales and Marketing, also stated under oath that the pipe replacement program distracted TCI personnel from making new sales. *See* Tr. Trans., Oct. 26, 2000, at 103-117.

[*17]   I noted this problem during argument, and counsel for TCI all but conceded that Dr. Latham had not sufficiently explained why TCI's market share would have remained at a constant 34% as it was in 1994:

> THE COURT: []. My concern is that he never justified to me why that market share stays the same in light of market changes in the world, the fact that Environ was a new company growing, whether or not there were other aggressive marketing techniques being used from other companies and this company, whether or no there were all kinds of other problems that affected price.

> [TCI COUNSEL]: Well, we have a problem here, because unfortunately, we had an expert who had to leave and none of that was presented.

*Daubert* Hrg., Aug. 10, 2001, 190-91.

Rather, counsel for TCI argues that the factual predicate for the selection of Dr. Latham's opinion should be laid by TCI fact witnesses at trial, rather that at a *Daubert* hearing. The point of a *Daubert* hearing is to make a preliminary assessment of the expert opinion's reliability. TCI delegated the task of creating an economic model, as it must, to its expert, Dr. Latham. He must select appropriate points of [*18]   comparison for his market share model and cannot delegate that task to non-expert employees at TCI. Thus, Dr. Latham bore the burden of explaining why 1994 remained reliable as a base to predict TCI's lost profits into 2005, rather than 1995 or a

multi-year average. This defect alone renders Dr. Latham's analysis unreliable. *See Paoli*, 35 745 (analysis unreliable where any step of analysis unsupported by good grounds); *see also JMJ Enters.*, 1998 U.S. Dist. LEXIS at *21 (assumptions with large effect on economic prediction must be given great attention and explanation).

## 2. Reliance on Unreliable Data

Dayco also faults Dr. Latham for relying on unreliable economic data. First, in constructing his market share model, Dr. Latham also had to include the respective market shares of TCI's two competitors: APT and Environ. [5] Dr. Latham's information on APT came mainly upon TCI executive John R. Wright and a Dun & Bradstreet report. Mr. Wright assumed, and Dr. Latham demurred, that all of APT's sales were into the jobber market and that all of APT's sales were of pipe. No independent verification of that may be found on the record. Lastly, the Dun & Bradstreet reports themselves [*19] are not a professionally accepted means of determining a company's sales. Dr. Latham himself acknowledged that "there are known difficulties with Dun and Bradstreet data." Daubert Hrg., Aug. 10, 2001, at 16. Mr. Osborne explained those problems in greater detail based on his experience as a former Chief Financial Officer [CFO]:

> A: The real use of Dun and Bradstreet is solely for debt payment obligations, when people - - companies don't pay their debts, and if you're going to extend credit, you want to know that, so you use a Dun and Bradstreet report to give you that information.

> The information that was included on this APT Dun and Bradstreet report was one number with no definition, no notes to the financial statement, no description as to what sales it was, and it was a very suspect number, because it - - there's no explanation as to what it is and what it does not represent.

> Q: Well, in your experience as a CFO, how reliable were sales number [sic] or annual sales numbers given to D&B?

> A: They're not reliable.

> Q: Why is that?

> A: -- for a private company, because private companies don't want to give that kind of information out.

Q: So, what do the [sic] tell [*20] D&B when D&B calls?

A: They'll give them, they'll answer questions and D&B's personnel asks them. They don't answer anything more, and depending on how they ask the questions, they'll give them an answer.

That's not something private companies in my experience want to do is to report information about sales. They don't want to do that, that's why [they're] private companies. They like to keep their information to themselves, and they're not going to give detailed information, and it will probably be highly suspect as to it's [sic] relevance and what it represents.

Q: In your professional experience how much reliability would you place on Dun and Bradstreet reports for precisely this information?

A: In and - - by itself?

Q: Yes

A: I give it no weight.

Q: Zero.

A: Zero weight.

*Daubert* Hrg., Aug. 10, 2001, at 94. Thus, the D&B report on APT did not provide Dr. Latham with good grounds for his testimony. To the extent the report was reliable at all, D&B did not define into which markets APT sold its products -- whether major oil or jobber, national or international. In short, comparing the APT sales data reported by Dun and Bradstreet with TCI's sales within the [*21] jobber market could lead to the sort of "apples and oranges" comparison condemned by the Second Circuit. *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)); *see also MTX Communs. Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 292-93 (S.D.N.Y. 2001) (excluding economic expert who conducted no independent verification of information for comparison purposes supplied by non-expert).

    5   The Court notes that Dr. Latham has not testified that he did independent research to determine if any other competitors controlled a significant share of the "independent jobber market."

Second, in projecting TCI's lost sales through 2005, Dr. Latham relies on a prediction made by Mr. Wright

that TCI would retain 80% of its customers each year, with no explanation made as to why that is a reasonable assumption. *See* June 2001 Latham Rpt. at 8. Mr. Wright, in the deposition [*22] excerpt provided to the court, admitted that the 80% figure came from him, but he provided no explanation of how he arrived at that crucial figure under accepted accounting of economics methods. Although TCI's sales figures were presented to Dr. Latham in abundance, and Dr. Latham could have computed such a crucial figure on his own, he did not. Without an acceptable prediction of TCI's retained customers, the prediction of sales through 2005 is unsupported.

While Dr. Latham also testified that he relied on trade journals such as the "Convenience Store News" and "National Petroleum Magazine," Dr. Latham made no specific reference to those journals in his report or in his testimony, leaving this court ill-equipped to examine precisely what data Dr. Latham gleaned from them. Thus, I cannot lend any credence to an assertion that those journals were part of the grounds for Dr. Latham's opinion.

As aptly summarized by Mr. Osborne, if relevant data is simply unavailable:

    A: I think you really have -- you have to think hard about what potential methodology you employ.

    You can't employ a methodology that on its face just uses data that's unsupported, untested, and unreliable because [*23] the level of risk, the error margin in that data is infinite, because there's no substantiation or no fact base in that data.

*Daubert* Hrg., Aug. 10, 2001, at 87-88. The model is so unreliable, Mr. Osborne testified, that one cannot ascertain whether TCI lost three million dollars in profits, or zero. *Id. at 97*.

## CONCLUSION

TCI has not produced sufficient evidence that Dr. Latham's proposed testimony is reliable and well-grounded. Dayco's motion in limine is granted, and Dr. Latham's expert testimony as to lost sales due to the price increase is excluded from the upcoming retrial.

An appropriate order follows.

## ORDER

**AND NOW**, this 6th day of **September, 2001**, upon consideration of Defendant's motion in limine to exclude the supplemental expert report of Dr. William Latham,

III, Plaintiff's opposition thereto, testimony and evidence presented at a *Daubert* hearing, oral argument thereon, and in light of the reasoning above, it is hereby **ORDERED** that:

Defendant Dayco Product's Motion in Limine (docket no. 233-5) is **GRANTED.** Dr. Latham shall not testify as an expert witness as to lost sales and profits due to [*24] Dayco's 1995 price increase (June

2001 Supplemental Report at 6-8) at the September 2001 Retrial.

**BY THE COURT:**

**Berle M. Schiller, J.**